IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| DANA GAUL,<br><br>    Plaintiff,<br>v.<br><br>CITY OF WORCESTER, Massachusetts,<br>WORCESTER POLICE OFFICERS<br>JOSEPH A. ALBANO, ELISA BAEZ,<br>DAN HEAVEY, SEAN LOVELY, TIM<br>FOLEY and AS-YET UNKNOWN<br>WORCESTER POLICE OFFICERS,<br><br>    Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)    **JURY TRIAL DEMANDED** |

## COMPLAINT

Now comes Plaintiff, DANA GAUL, by his attorneys, LOEVY & LOEVY, and

complaining of Defendants CITY OF WORCESTER, Massachusetts, WORCESTER

POLICE OFFICERS JOSEPH A. ALBANO, ELISA BAEZ, DAN HEAVEY, SEAN

LOVELY, TIM FOLEY, and AS-YET UNKNOWN WORCESTER POLICE

OFFICERS, Defendants, states as follows:

### Introduction

1.     Plaintiff Dana Gaul was wrongfully arrested and charged with murder

in 2021. Plaintiff was entirely innocent and there was never any legitimate evidence

connecting him to the murder. Defendants never made any serious effort to solve

the crime.

2.     On November 24, 2020, around 7:45 p.m., Jehlon Rose was stabbed on

Water Street in Worcester, MA.

1

3.   Mr. Rose died three days later from the stab wounds.

4.   The murder took place on a public street and there were multiple witnesses to the murder and to a fight between Mr. Rose and the murderer before the stabbing.

5.   Those witnesses gave Defendants a description of the murderer—a description that looks nothing like Plaintiff.

6.   Not one witness to the murder identified Plaintiff as being the murderer.

7.   DNA evidence—taken from the victim, who had been on top of the murderer before the stabbing—excluded Plaintiff as the culprit.

8.   Rather than conduct a proper investigation to find the real murderer, Defendants chose to take an easy route to "solve" the case by fabricating evidence against Plaintiff.

9.   This fabricated evidence included coercing third-parties (none of whom were at the scene of the murder) into agreeing that the grainy photos taken from surveillance video at the scene looked like Plaintiff and/or or unduly suggesting to those witnesses that the photos looked like Plaintiff.

10.   Defendants used this false identification evidence to arrest and indict Plaintiff, and they suppressed the true circumstances by which they procured their false identifications of him.

11.   Defendants also suppressed exculpatory evidence that supported that the murderer was someone else entirely. But because Plaintiff was Defendants'

chosen suspect, Defendants suppressed evidence undermining their theory or supporting that the murderer was someone else.

12. Even after receiving DNA evidence that excluded Plaintiff, Defendants continued to pursue his arrest and indictment.

13. Based on the fabricated witness identifications, unduly suggestive identification procedures, and false reports fabricated by Defendants, Plaintiff was charged with murder. His arrest was publicized by Defendants and Plaintiff served five months of wrongful imprisonment because of Defendants' misconduct. In addition, for eight months, Plaintiff lived with the possibility that he could spend the rest of his life in prison for a crime that he did not commit.

14. On February 11, 2022, the Commonwealth of Massachusetts asked the court to dismiss all charges against Plaintiff.

15. Plaintiff seeks justice for the harm that Defendants have caused him and redress for the loss of liberty and the hardship that he has endured, and continues to suffer, as a result of Defendants' misconduct.

### Jurisdiction and Venue

16. This action is brought under 42 U.S.C. § 1983 and Massachusetts law to redress the Defendants' tortious conduct and their deprivation of Plaintiff's rights secured by the U.S. Constitution.

17. This Court has jurisdiction over Plaintiff's federal claims under 28 U.S.C. § 1331 and supplemental jurisdiction of his state-law claims under 28 U.S.C. § 1367.

3

18. Venue is proper under 28 U.S.C. § 1391(b). Plaintiff resides in this judicial district. Upon information and belief, the events and omissions giving rise to Plaintiff's claims in this complaint occurred within this judicial district.

Parties

19. Plaintiff Dana Gaul is 43 years old and a resident of Massachusetts.

20. Defendants Joseph A. Albano, Elisa Baez, Dan Heavey, Sean Lovely, Tim Foley, and As-Yet Unknown Worcester Police Officers are current or former officers of the Worcester Police Department. These Defendants were responsible for investigating crimes, including the crime at issue in this case, and for supervising other police officer Defendants. These Defendants committed, facilitated, and approved the constitutional violations at issue in this case. Collectively, these Defendants are referred to in this Complaint as the Individual Defendants.

21. Defendant City of Worcester, Massachusetts, is a municipality of the State of Massachusetts, which oversees the Worcester Police Department. Each of the Defendants referenced above was employed by the City of Worcester or was acting as an agent of the City of Worcester and the Worcester Police Department while conducting the investigation described in this Complaint. Defendant City of Worcester is therefore liable for all torts committed by these Defendants pursuant to the doctrine of *respondeat superior*. Defendant City of Worcester is additionally responsible for the policies and practices of the Worcester Police Department, which were implemented by Defendants in this case. Finally, Defendant City of Worcester

4

is responsible under Massachusetts law for any judgment entered against Defendants.

22. At all times relevant to the events described in this Complaint, each of the individual Defendants acted under color of law, within the scope of his employment, and as an investigator. Each of the individual Defendants is sued in his individual capacity, unless otherwise noted.

## FACTS

### The Murder of Jehlon Rose

23. On November 24, 2020, Jehlon Rose was stabbed on Water Street in Worcester, MA. Mr. Rose died three days later from the stab wounds.

24. Witnesses to the murder described the murder as a thin/skinny, light-skinned/white man, who was 5'7" tall.

25. Plaintiff did not match the description given by witnesses—he is a Black man, who weighs 200 lbs. and is 5'10" tall.

26. Not one witness to the murder ever identified Plaintiff as being present.

27. That is because Plaintiff was nowhere near the murder and is completely innocent.

28. In fact, another person told police that he was the one who was in the fight with Mr. Rose. Unlike Plaintiff, that person had a long history of violent offenses and matched the description given by witnesses to the murder.

## DNA Evidence Excludes Plaintiff as the Murderer

29. The murderer fought with Mr. Rose before stabbing him—the confrontation left biological evidence, including from under Mr. Rose's fingernails, from the murderer that allowed for DNA testing to identify the murderer.

30. That DNA evidence completely exonerates Plaintiff as being the murderer.

31. Defendants were aware that the DNA evidence excluded Plaintiff, yet proceeded to seek Plaintiff's indictment for the murder.

## Defendants Fabricated Identifications of Plaintiff's Using Grainy Video

32. The murder and confrontations took place on a public street outside various businesses, and there was surveillance video from the area both before and after the murder. In addition, a witness and the victim took video of interactions between Mr. Rose and the man he fought with.

33. None of the video shows the actual stabbing.

34. None of the video, which was taken at nighttime, clearly showed the perpetrator.

35. Nevertheless, Defendants Albano and/or Baez obtained still images from the video in an effort to build a false case against Plaintiff.

36. Defendants, who had known Plaintiff from prior interactions, set about to easily "solve" the murder by falsely implicating him.

37. Because none of the eyewitnesses to the murder identified Plaintiff, Defendants Albano and/or Baez used unclear still images from the video to create

false evidence against Plaintiff by manipulating an identification procedure that would lead to false identification of Plaintiff as being the person in the images from the video.

38. This manipulation included: (1) pressuring vulnerable and/or compliant persons to falsely identify Plaintiff; and/or (2) the use of suggestive identification techniques to lead to false identifications of Plaintiff.

39. To facilitate falsely accusing Plaintiff of the murder, Defendants Dan Heavey, Sean Lovely, and Tim Foley falsely identified images from video of the fight as being Plaintiff.

40. Not one of the persons who provided the manufactured identifications of the video images was present at the murder. Instead, they coerced or convinced third parties to falsely agree that the unclear video images looked like Plaintiff.

41. One of the purported identification witnesses was a woman with a long criminal record and pending criminal charges. Defendants falsely identified this woman as being Plaintiff's cousin in an effort to boost her credibility. Defendants used the pendency of the woman's criminal charges to pressure her into providing a false identification of Plaintiff. Defendants did not disclose these actions.

42. Defendants further used a suggestive identification process, took advantage of her mental state, and/or pressured the woman to falsely identify Plaintiff from an image from the scene. Defendants did not disclose these actions.

43. Defendants also hid evidence that other witnesses identified people other than Plaintiff from images taken from the video at the scene of the murder.

### Defendants Used the Fabricated Evidence to Arrest Plaintiff

44. On June 24, 2021, based on the fabricated identification evidence from the video images, Defendants obtained an arrest warrant against Plaintiff.

45. Defendants did not disclose to anyone that the evidence used to obtain the evidence was fabricated and/or based on unduly suggestive procedures.

46. Nor did Defendants disclose the exculpatory evidence that demonstrated Plaintiff's innocence.

### Plaintiff's Damages

47. Although he is now free, the damages to Plaintiff from his wrongful conviction are substantial.

48. Plaintiff was taken into custody for a crime that he did not commit.

49. Plaintiff was forced to spend five months of his life wrongfully imprisoned.

50. For eight months, Plaintiff had to live with a possible life sentence hanging over his head for a crime that he was totally innocent of.

51. Because of Defendants' misconduct, Plaintiff suffered trauma from the wrongful arrest and Plaintiff's loss of liberty. Defendants' misconduct continues to cause Plaintiff pain and suffering, humiliation, constant fear, anxiety, and other physical and psychological effects.

### The City of Worcester Caused Plaintiff's Damages

52. Plaintiff's injuries were caused by the official policies of Defendant City of Worcester and the Worcester Police Department, by the practices and customs of

Defendant City of Worcester and the Worcester Police Department, as well as by the actions of final policymaking officials for Defendant City of Worcester and the Worcester Police Department.

53. At all times relevant to the events described in this Complaint and for a period of time prior thereto, Defendant City of Worcester promulgated rules, regulations, policies, and procedures governing witness interviews, identification procedures, preservation and disclosure of investigative materials and evidence, questioning of criminal suspects, in-court testimony, preparation and presentation of witness testimony, and training, supervision, and discipline of employees and agents of the City of Worcester, including employees and agents of the Worcester Police Department.

54. These rules, regulations, policies, and procedures were implemented by employees and agents of Defendant City of Worcester, including the individual Defendants, who were responsible for conducting investigations of crimes in and around Worcester, Massachusetts.

55. Worcester did not have any written policies on how to conduct proper identification procedures, or on how to interview a witness, victim, or suspect.

56. The Worcester Police Department had no such policy, despite that in the decades prior to the investigation at issue there were firmly established, national standards governing these subjects.

57. In fact, the requirements for conducting fair and objective investigations involving photo identifications were widely known and accepted as

9

best practice and established as a nationally accepted standard of law enforcement practice. Those standards were set by and reflected in the 1992 International Association of Chiefs of Police Training Key on photo identifications as well as the 1999 United States Department of Justice Report on Eyewitness Identification.

58. The inherent dangers and damage to innocent parties when these procedures were not followed were also known.

59. Nonetheless, the Worcester Police Department had no policies on how to conduct proper identification techniques.

60. The Worcester Police Department also had no policies on how to conduct an interview of a witness, victim, or suspect.

61. As a result, the Worcester Police Department had no policy precluding a detective from feeding a witness or suspect information about a crime, or to share information about what another person may have said about a crime, although the proper practice was not to do so.

62. Nor did the Worcester Police Department have a policy requiring that the detective disclose all information received from a witness to the prosecutor.

63. In addition, the Worcester Police Department had no training on how to conduct interviews of witnesses and victims.

64. Instead, officers learned how to conduct those interviews on the job, typically from officers who had also not been trained in the appropriate way to conduct an interview.

65. Similarly, the Worcester Police Department had no training on how to conduct proper identification techniques.

66. The problem with relying on on-the-job training without formal policies, procedures and training is that if what is taught is contrary, incompatible with, or does not address nationally accepted standards of law enforcement practice, that manner of inappropriate conduct may be perpetuated. Such was the case with the Worcester Police Department.

67. Because identification procedures were widely and frequently used by the Worcester Police Department officer as a means of identification, it was incumbent upon it to ensure that all investigators received appropriate training and to have written directives to provide guidelines for properly conducting photo arrays.

68. The absence of these necessary policies is the reason that Defendants obtained corrupted identifications by using unduly suggestive identification procedures, and it is the reason they fabricated purported evidence from witnesses.

69. Defendant City of Worcester provided no training about the proper use of identification procedures, the need for which on these subjects and the risks of not training were both obvious to the Worcester Police Department.

70. In addition, at all times relevant to the events described in this Complaint and for a period of time prior thereto, Defendant City of Worcester had notice of a widespread practice by its officers and agents in which suspects were routinely subject to manipulated and distorted identification procedures, deprived

of exculpatory evidence, were subjected to criminal proceedings based on false evidence, and/or were deprived of their liberty without probable cause, such that individuals were routinely implicated in alleged crimes to which they had no connection and for which there was scant evidence to suggest that they were involved. This notice includes the following cases (many of which were reported to prosecutors in 2018):

a. *Commonwealth v. Ayala Melendez*, a Worcester Police Department officer submitted a false report in fall 2019 in which the narrative of the report was directly rebutted by video evidence. As here, that false narrative was used to bring criminal charges against Ayala Melendez. The Worcester Police Department's policymaker, the chief of police, admitted in a signed statement to the Worcester County District Attorney's office that the Worcester officer who filed the false report had "lied about a defendant's conduct and thereby allowed a false or inflated criminal charge to be prosecuted." The Worcester Police Department's policymaker, the chief of police, thereafter publicly excused the misconduct, thereby signaling to officers that they would not be held accountable for making false reports.

b. *Commonwealth v. Katana*, Worcester District Court, 1662CR1276, Worcester police fabricated evidence in police reports to justify a February 2016 arrest for murder. The reports were rebutted by video evidence. The charges were dismissed.

c. *Commonwealth v. Skerrett*, Worcester District Court, 1562CR8283—
Worcester police fabricated the facts of an arrest in October 2015 to
obtain false charges. The fabricated evidence was rebutted by video
evidence.

d. *Commonwealth v. Johnson*, 1462CR7909 (*see also Johnson v.
Supernor, et al.*, United States District Court, Case No. 4:17-cv-40103)
Worcester police fabricated evidence in reports to justify false charges
stemming from an August 2014 arrest. In dismissing charges, the trial
court judge stated, "There is this thing called the Constitution. Maybe
they [Worcester police officers] should read it."

e. *Commonwealth v. Ortiz*, Worcester District Court 142CR820,
Worcester police fabricated evidence in reports about the location of
evidence in order to justify a warrantless search in August 2014. The
fabrication was documented by photographs of the evidence.

f. *Commonwealth v. Deptula*, Worcester District Court 1462CR2641,
Worcester police fabricated evidence in reports to justify wrongful
arrest in March 2014.

g. *Commonwealth v. Rivera*, 1362CR10854 (*see also Rivera v. City of
Worcester*, United States District Court, Case No. 4:17-cv-40029-TSH),
Worcester police fabricated reports to obtain a warrant and to justify
the excessive use of force in December 2013.

h. *Commonwealth v. Burgos-Martinez,* 1362CR5609 (*see also Burgos-Martinez v. City of Worcester et al,* United States District Court 4:16-cv-4-128), Worcester police fabricated reports to bring charges without probable cause based on an arrest in July 2013. The charges were dismissed in 2018.

i. *Commonwealth v. Ruiz,* Worcester District Court, 1262CR4277 (*see also Ruiz v. Nason, et al.,* United States District Court, Case No. 4:15-cv-40076), Worcester police fabricated evidence in reports to bring charges stemming from a June 2012 arrest. The false reports were contradicted by video evidence.

71. Despite knowledge that its officers engaged in false reporting to wrongly justify police action, at all pertinent times the City of Worcester failed to supervise its officers as a matter of policy, custom, and practice. This failure to supervise allowed officers,
including Defendants here, to violate civil rights and engage in misconduct, including the fabrication of evidence in police reports.

72. The City of Worcester had a policy, custom, and practice of failing to discipline its officers who violated the rights of citizens, including the fabrication of evidence.

73. The Worcester Police Department's Bureau of Professional Standards ("BPS"), which was responsible for supervising/investigating officers relating to

allegations of misconduct ignored credible allegations and evidence of police misconduct.

74. The BPS' refusal to investigate credible allegations of police misconduct and/or its refusal to make findings of misconduct in the face of credible evidence led officers to believe that they could act with impunity.

75. The BPS' investigatory process and practices do not comply with nationally accepted policing standards.

76. For instance, at all relevant times, the Worcester Police Department permitted police officers accused of wrongdoing to submit written statements without participating in in-person interviews.

77. In contrast, citizen complainants were subject to adversarial interrogation by Worcester Police Department officers.

78. The Worcester Police Department refused to investigate complaints when citizens were not willing or able to allow the interrogations by Worcester Police Department investigators.

79. This led to the failure to even investigate an inordinate number of credible claims of police misconduct.

80. Nationally acceptable police investigatory practices require, except in cases of minor procedural violations, that all interviews of police officers accused of violations of police policies and procedures should be conducted in person and that they be recorded and transcribed.

15

81. The City of Worcester's failure to follow these standards allowed officers to avoid supervision and/or discipline by simply tendering vague, perfunctory reports that were routinely accepted as true.

82. This practice led officers, including Defendants here, to believe that they would not be held accountable for violating citizens' rights because they were aware that they would not be properly investigated.

83. These widespread practices were allowed to flourish because the leaders, supervisors, and policymakers of Defendant City of Worcester directly encouraged and were thereby the moving force behind the very type of misconduct at issue by failing to adequately train, supervise, and discipline their officers, agents, and employees who withheld material evidence, fabricated false evidence and witness testimony, and pursued wrongful prosecutions and convictions.

84. The above-described widespread practices, which were so well settled as to constitute the *de facto* policy of the City of Worcester, were allowed to exist because municipal policymakers with authority over the same exhibited deliberate indifference to the problem, thereby effectively ratifying it.

85. The misconduct described herein was undertaken pursuant to the policy and practices of Defendant City of Worcester in that the constitutional violations committed against Plaintiff were committed with the knowledge or approval of persons with final policymaking authority for the City of Worcester and the Worcester Police Department, or were actually committed by persons with such final policymaking authority.

86. The policies, practices, and customs set forth above were the moving force behind the numerous constitutional violations in this case and directly and proximately caused Plaintiff to suffer the grievous and permanent injuries and damages set forth above.

87. Plaintiff's injuries were caused by officers, agents, and employees of the City of Worcester and the Worcester Police Department, including but not limited to the individually named Defendants, who acted pursuant to the policies, practices, and customs set forth above in engaging in the misconduct described in this Count.

**COUNT I—42 U.S.C. § 1983**
**42 U.S.C. § 1983 – Federal Malicious Prosecution**

88. Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

89. In the manner described above, Defendants, acting as investigators, individually, jointly, and in conspiracy with one another, as well as under color of law and within the scope of their employment, accused Plaintiff of criminal activity and exerted influence to initiate, continue, and perpetuate judicial proceedings against Plaintiff without any probable cause for doing so and despite knowing that Plaintiff was innocent.

90. In doing so, Defendants caused Plaintiff to be unreasonably seized without probable cause and deprived of his liberty, in violation of Plaintiff's rights secured by the Fourth and Fourteenth Amendments. The false judicial proceedings against Plaintiff were instituted and continued maliciously, resulting in injury.

91. Defendants also deprived Plaintiff of fair state criminal proceedings, including the chance to defend himself during those proceedings, resulting in a deprivation of his liberty, and Massachusetts law does not provide an adequate state-law tort remedy to redress that harm.

92. In addition, Defendants subjected Plaintiff to arbitrary governmental action that shocks the conscience in that Plaintiff was deliberately and intentionally framed for a crime of which he was totally innocent, through Defendants' fabrication and suppression of evidence and their use of unduly suggestive identification procedures.

93. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the rights of others, and in total disregard of the truth and Plaintiff's clear innocence.

94. As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

95. On February 11, 2022, the judicial proceedings against Plaintiff were terminated in his favor, in a manner indicative of his innocence, when the Commonwealth of Massachusetts entered a *nolle prosequi*.

96. Defendants' misconduct described in this Count was undertaken pursuant to the policies, practices, and customs of Defendant City of Worcester, and

18

by Defendants who were final policymakers for Defendant City of Worcester, in the manner more fully described above.

**COUNT II**
**42 U.S.C. § 1983 – Arrest without Probable Cause**

97. Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

98. Defendants arrested Plaintiff based on the false evidence that they fabricated.

99. Defendants did not have probable cause to perform the arrest on Plaintiff.

100. Plaintiff was harmed by Defendant's arrest without probable cause.

101. The Worcester Defendants' misconduct described in this Count was undertaken pursuant to the policies, practices, and customs of Defendant City of Worcester, and by Defendants who were final policymakers for Defendant City of Worcester, in the manner more fully described above.

**COUNT III**
**42 U.S.C. § 1983 – Equal Protection**

102. Each of the Paragraphs of this Complaint is incorporated as if fully stated herein.

103. In the manner described in this Complaint, Defendants violated Plaintiff's constitutional rights intentionally subjecting him to unlawful, unequal treatment on the basis of his race in violation of the Fourteenth Amendment of the United States Constitution.

19

104. Defendants' misconduct created discriminatory effect by targeting Plaintiff for police action based on his race.

105. Plaintiff is a Black man, and but for his race, Defendants would not have targeted him for unlawful arrest, imprisonment, and/or malicious prosecution based on the flimsy evidence it had. In fact, the witnesses to the murder described the assailant as white, a description that does not match Plaintiff.

106. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally with willful indifference to Plaintiff's constitutional rights.

107. The Worcester Defendants' misconduct described in this Count was undertaken pursuant to the policies, practices, and customs of Defendant City of Worcester, and by Defendants who were final policymakers for Defendant City of Worcester, in the manner more fully described above.

## COUNT IV
### 42 U.S.C. § 1983 – Conspiracy to Deprive Constitutional Rights

108. Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

109. Defendants, acting in concert with other co-conspirators, known and unknown, reached an agreement among themselves to frame Plaintiff for murder, a crime he did not commit, and thereby to deprive him of his constitutional rights, all as described in the various paragraphs of this Complaint.

110. In so doing, these co-conspirators conspired to accomplish an unlawful purpose by an unlawful means. In addition, these co-conspirators agreed among

20

themselves to protect one another from liability for depriving Plaintiff of these rights.

111. In furtherance of their conspiracy, each of these co-conspirators committed overt acts and were otherwise willful participants in joint activity.

112. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the rights of others, and in total disregard of the truth and Plaintiff's clear innocence.

113. As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

114. Defendants' misconduct described in this Count was undertaken pursuant to the policies, practices, and customs of Defendant City of Worcester, and by Defendants who were final policymakers for Defendant City of Worcester, in the manner more fully described above.

## COUNT V
### 42 U.S.C. § 1983 – Failure to Intervene

115. Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

116. In the manner described above, during the constitutional violations described herein, one or more Defendants stood by without intervening to prevent the violation of Plaintiff's constitutional rights, even though they had the opportunity to do so.

117. As a result of Defendants' failure to intervene to prevent the violation of Plaintiff's constitutional rights, Plaintiff suffered pain and injury, as well as emotional distress. These Defendants had ample, reasonable opportunities to prevent this harm but failed to do so.

118. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, reckless indifference to the rights of others, and in total disregard of the truth and Plaintiff's clear innocence.

119. As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

120. Defendants' misconduct described in this Count was undertaken pursuant to the policies, practices, and customs of Defendant City of Worcester, and by Defendants who were final policymakers for Defendant City of Worcester, in the manner more fully described above.

## COUNT VI
### State Law Claim – Intentional Infliction of Emotional Distress

121. Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

122. As a proximate result of the arrest and initiation of the prosecution of Plaintiff for the Rose murder without probable cause and with malice by Defendants, Plaintiff was wrongly imprisoned and faced the prospect of a life in prison for a crime he did not commit.

22

123. The acts and omissions of Defendants in initiating the prosecution of Plaintiff was made without probable cause. Fabricating evidence and withholding exculpatory evidence in order to convict an innocent man is extreme and outrageous conduct, beyond all possible bounds of decency and utterly intolerable in a civilized community.

124. The defendants' acts and omissions caused Plaintiff to suffer severe emotional distress of a nature that no reasonable person could be expected to endure as described above.

125. These actions constitute the tort of intentional infliction of emotional distress under Massachusetts law.

126. As a result of the Defendants' intentional infliction of emotional distress, Plaintiff has suffered damages as described above.

127. Defendants are liable to the Plaintiff for injuries and damages resulting from their acts and omissions that intentionally inflicted emotional distress upon the Plaintiff.

**COUNT VII**
**State-Law Claim – Malicious Prosecution**

128. Plaintiff incorporates each paragraph of this Complaint as if fully set forth here.

129. In the manner described above, Defendants, acting as investigators, individually, jointly, or in conspiracy with one another, as well as within the scope of their employment, accused Plaintiff of criminal activity and exerted influence to initiate, continue, and perpetuate judicial proceedings against Plaintiff without any

probable cause for doing so and in spite of the fact that they knew Plaintiff was innocent.

130.     In so doing, these Defendants caused Plaintiff to be subjected improperly to judicial proceedings for which there was no probable cause. These judicial proceedings were instituted and continued maliciously, resulting in injury.

131.     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the rights of others, and in total disregard of the truth and Plaintiff's clear innocence.

132.     As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

133.     On February 11, 2022, the judicial proceedings against Plaintiff were terminated in his favor, in a manner indicative of his innocence, when the Commonwealth of Massachusetts entered a *nolle prosequi*.

## COUNT VIII
### State-Law Claim – Negligence

134.     Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

135.     Defendants owed Plaintiff a duty to refrain from framing him for a crime he had not committed and to conduct a legal and thorough investigation of the murder of Jehlon Rose that would not result in an arrest without probable cause.

24

136. In the manner described more fully above, the actions, omissions, and conduct of Defendants breached this duty.

137. The misconduct described in this Count was objectively unreasonable and was undertaken in total disregard of the truth and Plaintiff's clear innocence.

138. As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

## COUNT IX
### State-Law Claim – Indemnification

139. Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

140. Massachusetts law provides that public entities are to pay tort judgments for which employees are liable within the scope of their employment activities.

141. The Worcester Police Defendants were employees, members, and agents of the City of Worcester, acting at all relevant times within the scope of their employment in committing the misconduct described herein.

WHEREFORE, Plaintiff, DANA GAUL, respectfully requests that this Court enter a judgment in his favor and against Defendants CITY OF WORCESTER, Massachusetts, WORCESTER POLICE OFFICERS JOSEPH A. ALBANO, ELISA BAEZ, DAN HEAVEY, SEAN LOVELY, TIM FOLEY, and AS-YET UNKNOWN WORCESTER POLICE OFFICERS, awarding compensatory

25

damages, attorneys' fees, and costs against each Defendant, punitive damages against each of the individual Defendants, and any other relief this Court deems just and appropriate.

## JURY DEMAND

Plaintiff, DANA GAUL, hereby demands a trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on all issues so triable.

RESPECTFULLY SUBMITTED,

**DANA GAUL**

BY:     /s/ Mark Loevy-Reyes
         *One of Plaintiff's Attorneys*

Jon Loevy*
Debra Loevy, BBO #569212
Mark Loevy-Reyes, BBO #707974
LOEVY & LOEVY
311 N. Aberdeen St., 3rd Fl.
P: (312) 243-5900
F: (312) 243-5902
mark@loevy.com
*\*Pro hac vice* application forthcoming